We'll now hear argument on United States v. Archer. All right, Ms. Eddie?  You may proceed. You've reserved two minutes for rebuttal, correct? I have, Your Honor. May it please the Court, Sarah Eddie for the United States of America. This Court should reinstate the jury's verdict of guilty against Devin Archer. In granting a new trial, the District Court both usurped the jury's role, which is a point I'd like to get back to in a moment, but also unfairly assessed the evidence. Fairly viewed, the evidence in this case showed that Devin Archer was not Jason Galanis's dupe or his pawn. He was a joint participant in a scheme to misappropriate bond proceeds for the purposes of building a business empire. Now, a basic This is different, though, isn't it, from the cases in which the judge or the jury has reached credibility determinations, because there really isn't a credibility issue here involving this particular defendant. It's all a question of the inferences and how you draw the inferences. I think that's exactly right, Your Honor. The judge found that there was sufficient evidence drawing the inferences in the favor of the government to get to the jury, Rule 29. But then looked at the inferences and drew different conclusions from the jury in terms of her concession of her look at the evidence and where the inferences should be drawn. That's one of our points on appeal, Your Honor, is that it was improper for the Court to have approached the case that way. And that is because, although the district court has discretion in extraordinary circumstances, it has discretion to use sparingly to revisit the evidence and re-weigh the evidence, it can only grant a new trial based on weight of the evidence when the evidence preponderates heavily against the verdict. In this case, I think, in many ways, I mean, you're asking us basically to overturn a discretionary finding by a judge who made careful findings about the case. But that's one other question I have, is whether the evidence preponderates is the test. That's the Sanchez test, right? That is, Your Honor. It goes back, you know, 26 years. And we haven't really, I don't think, followed it in the Second Circuit since. Now, we don't get a lot of these cases, I have to say. I think it does come from the 1992 case. It's the standard that's applied across all the other circuits. And I think, actually, it was applied, in a sense, in the Ferguson case. In a sense. In a sense. And let me explain that. The district court in Ferguson cited the standard in granting the new trial in that case. And this court, in affirming the district court's decision, noted that the problem with the evidence of that the motive there was for pecuniary gain was that there was an absolute absence of connecting evidence between the payment that was made and the motive for which it was made. So absolute absence of connecting evidence. That is not this case. And also, that is consistent with the heavily preponderates standard. In this case, the evidence, you know, a basic premise of the district court's opinion here was that the fraud charged was Jason Galanis stealing the money, stealing the proceeds for his own purposes. Scalia. He repeatedly refers to that in her opinion. Right. And that was not the gist of the fraud that was charged or that was proved to the jury. The gist of the fraud was Galanis, Archer, and Cooney together engaged in a joint enterprise to misappropriate the money for their joint roll-up plan to build their business empire. And Archer had not just circumstantial, there wasn't just circumstantial evidence of this. So your position, I take it, and this is really for the benefit of the other side, is that if Archer didn't know that Galanis was taking money for himself, you argue differently because of the house, because of the apartment or house or whatever it was. But if that was the case, that he did not know about any personal theft by Galanis, that the essence of the fraud was there because the money wasn't being used for the benefit of the tribe. And it was going into their own business ventures, which to all appearances looked legal, but the source of the money was fraudulent. And Archer, there was enough for Archer to know about that. Absolutely, Your Honor. I mean, the fraud here, the first part of the fraud was getting the bonds issued with a false promise of an annuity. And the evidence was clear that Archer knew about the false promise. There was no evidence of an actual annuity in this case? No. There was no annuity, and Archer was aware of that. From the whole point of the bond issuances was to fund and capitalize the roll-up plan for these three men. And he's on the e-mails. And is your argument in one sense that, just to go back to this point, is your argument in one sense that we can always review an abuse of discretion if a judge makes a mistake of fact or if the findings aren't in accordance with the facts, and that by relying on Golanus' personal theft of money and repeatedly relying on it, that that's evidence that, pretty clear evidence that she abused her discretion? I think it is. Because she misjudged, she didn't really have a grasp of what the fraud was. Right. I think she sort of misidentified the forest, but then also missed the forest for the trees in not looking at the evidence as a whole. And just to close the loop a little bit on... Well, I'm not talking about that. I'm talking about what the money was used for. Right. And where it ended up. It ended up in the business ventures, which were, you know, involved a lot of legitimate companies as well as some fake ones. But... That... Right. And what was Archer's knowledge of that? And, well, his knowledge, he's on the e-mails from June and July of 2014, talking with Golanus about how they're going to use these bond proceeds, for example, to buy Fond Invest and to buy Valor Life. That's exactly what happens. There's and I want to make one point here. The district court relied... That's inconsistent with an annuity? I mean, it's not that you can't do both?  But did he know even that there was supposed to be an annuity? He absolutely knew there was supposed to be an annuity, and the district court accepted that. I'll just cite a few exhibits that prove that. It's Government Exhibit 2011, 2120, and 2218. All of those show that he knows the representation is being made that there's an annuity. And then there's this exhibit, Government Exhibit 1235, which is one the district court relies on as supposedly exculpatory. Now, this is the one where Golanus is telling Archer the deal is closed. And, you know, you may want to reach out to the tribe's lawyers at some point and talk to them, make sure they know you're associated with the wealth assurance annuity. And by the way, an annuity is a 20-year contract with an investment manager, Hercules has been appointed. Now, this is not, I think, that the fair reading of this email in light of all of the evidence is this is Golanus reminding Archer how to keep their story straight. He's telling Archer what to say, not duping Archer. There is no manager involved in this case. Archer is well aware because he's having these discussions with Golanus. He's well aware that Golanus and he are the ones directing where these proceeds go. And the proceeds do go to the roll-up plan. As I said, they buy Fond Invest. They fund Valor Life. They go to payments for Burnham Financial and VL Assurance. What exhibit is that again? Sorry? What exhibit is that? The payments. The one you just read from. 1235. 1235. And I see my time is up, but I would like to, if I could, address, because it's such a big part of the case, the district court's analysis of the $15 million. Now, there is direct evidence, right? Archer and Golanus and Cooney are talking over email before the First Dish ones all about how they want to get their hands on discretionary liquidity, honey liquid, you know, liquid cash. This is what they're waiting for, the First Dish ones. And then two weeks after the First Dish ones closes, Archer is getting $15 million in cash from Golanus through a circuitous route they both know is meant to hide the source of the funds. And he's buying up more bonds with that money, right? Generating the appearance of a market for these bonds. Some of those bonds he gets go and they are used to prop up the net capital for the roll-up companies, Burnham Securities, Bonwick. Now, in the midst of all this, Archer is telling lies about the source of these funds. And he's doing that because he knows they are misappropriated bond proceeds. If he didn't realize that these $20 million that he and Cooney were using to buy up the entire second issuance were bond proceeds from the First Dish ones, then what does he think happened to all the discretionary liquidity that was generated by the First Dish ones? What does he think went to where did that money go? Why isn't he asking Golanus, where's our money? So I think the district court's conclusion with respect to the $15 million is simply unsupported by the record. I've reserved two minutes for rebuttal. So I'll address that. We'll now hear from Mr. Schwartz. You may proceed, Mr. Schwartz. Thank you, and may it please the court. In this case, an experienced district judge presided over a complex, six-week-long, three-defendant trial, and in which there was absolutely no direct evidence of Devin Archer's guilt. Judge Abrams reviewed all of the evidence that the government pointed to as guilt- inducing, as well as the record as a whole. She cited all of the proper legal standards. Judge Abrams repeatedly recognized that Devin— She said, I have serious concerns about whether he might be innocent. Now, that's not evidence preponderating, is it? I think read fairly. It's facts in terms, to me, of a thirteenth juror, somebody who doesn't agree with what the jury decided based upon her reading of the case, not — and not based upon an assessment of credibility of witnesses, but based upon her analysis of the circumstantial evidence and the inferences to be drawn from it. With respect to the jury was able to do, because all of these — virtually all of these arguments were made to the jury. With respect, I disagree with that. Judge Abrams recognized repeatedly the deference that was due to the jury's verdict. She said she did not overturn its verdict lightly. But she felt — she felt something about this case that gave her — made her uneasy. Yes. She felt — What was the impression I had? She felt manifest injustice, which is the standard — Mr. Schwartz, this preponderates heavily against the evidence. Is that the standard? So I think that's going to be a somewhat academic debate, but I don't read that as the standard in this circuit in cases based on the weight of the evidence. The Court, to my reading, has used the preponderates heavily language in cases in which, on the Rule 33 analysis, essentially something is being added to or taken away from the trial record. Either witnesses are being thrown out because the Court is making — Perjured testimony only. Or there's newly discovered evidence. And so in those cases, the Court has reasonably said, instead of looking at the trial record, we're looking at the Rule 33 record, which may be plus or minus, and says, in that instance, does the remaining evidence preponderate heavily in favor of innocence? In a case like this, as in Ferguson, as in another case that this Court decided called Burden, the Court has not applied those standards where it's simply about the weight of the evidence. And I agree that — Where does this go? I'm just curious. I mean, she denied the Rule 29 motion but grants the Rule 33. So we'll just keep doing this over and over, and we'll say that it meets Rule 33 but it won't meet Rule 29. I mean, because presumably there's not more evidence to be had. And so this seems like a catch-22. Well, I mean, this is exactly the issue that this Court addressed in literally the first paragraph of Ferguson, where it said sometimes denying a Rule 29, granting a Rule 33 is going to seem like a waste of resources, but it's never a waste of resources to have a trial that's not tainted with manifest injustice. But we should just ask the jury to keep doing it until they get it right? I don't think so. I don't think so. I think in this instance, one of two things will happen on remand, assuming that the Court affirms. One is that the government will change their case, and inevitably the case is going to change. It's no longer a three-defendant case. You know, and they'll tailor their case to what they believe the best evidence of Mr. Archer's guilt is, or different evidence. I don't know whether they have the same evidence or not. Or they'll decide that the interests of justice don't weigh in favor of retrying the case. With respect, I don't think- But if they try it the same way, then it seems to me we just keep doing it, right? I think in the hypothetical in which the retrial was literally identical to the first trial, we would get into a feedback loop. But that is practically impossible. But it seems pretty illogical, doesn't it? I don't think it's illogical. I mean, you asked for Rule 29. We did. And so, but you're not arguing for that now. I would if I were permitted to. But as I understand this Court's precedent, I could not take an interlocutory appeal. Mr. Archer could not take an interlocutory appeal of the denial of the Rule 29. And to suggest a logical impossibility would mean that the 29 standard and the 33 standard are the same. That's exactly the point. And this Court has recognized over and over again that Rule 33 exists precisely for a situation like this. It certainly exists when something happens, witnesses change their story or recants or, you know, something or there's some evidence that's, you know, or a legal question comes up. And it seems to me that where witnesses, I kept wondering whether because there had been a trial and she was there and she heard all the evidence, that that should be, she should get deference in the Rule 33 context for her views. But this isn't that kind of a case where she could have heard the witnesses and come to her and recognize that the case is vastly different from the way it was argued to the jury and why the jury reached a conclusion they did. That's, this isn't that kind of a case. It's a case of weighing, of looking at these inferences and saying I can reach the better outcome by looking at these inferences than the jury did. So let me say two things in response to that. One is as a legal matter, in footnote one of Ferguson, the court rejected precisely the idea that in a situation like that a different standard or less deference should be given to the district court's determination. All right, and so as a legal matter, I don't think that's correct. It rejected a different standard on appellate review for a sufficiency of the evidence Rule 33. Thank you, that's exactly right. And held that in that case, great deference, broad deference is still due to the district court's determination. And I think that makes sense. It makes sense because even if the district court is not making credibility determinations, there is a tangible advantage to living through a trial. And in this case, again, it was a six week long trial, 4,000 transcript pages, tens of thousands of pages of exhibits. This court could read all of that, and I'm sure you will, and still not appreciate the case and its nuance in the way that Judge Abrams lived through it. But this is a situation where all the arguments that have been made or that were relied upon by Judge Abrams in concluding that the Rule 33 standard was met were arguments made to the jury, right? That's always the case. Well, it's not always the case, but that's certainly the case here, right? If I hadn't made these arguments, the government would argue that they were unpreserved. It is always the case, I think, in a Rule 33 on the sufficiency of the evidence, that the jury comes out one way and the district court says, notwithstanding the jury's verdict, a manifest injustice has occurred. And that's why the standard is so- The manifest injustice is because Judge Abrams reached different conclusions with respect to the meaning of certain exhibits, right? Judge Abrams drew different inferences or in some cases rejected the government's issue, urged inferences as unduly speculative. But not just that, because in this case there was a plus factor. It wasn't just that the government's evidence of guilt was very, very, very weak, but that there was a tremendous amount of countervailing evidence that pointed affirmatively to Mr. Archer's innocence. And I'd suggest to you on the Rule 29 analysis, that sort of doesn't matter, right? As long as there's one piece of evidence that a rational juror could look at and draw an inference of guilt beyond a reasonable doubt, she's got to deny the Rule 29. But if there's an avalanche of evidence the other way, pointing affirmatively at innocence, she would still have to deny the Rule 29, but the Rule 33 would be granted, and that's what happened here. Was there a fraud here in the absence of, in the absence of Golanus actually pocketing the money? I want to thank you for that question. Because it seems to me that if there was to be a, if they were going to buy, get an annuity for the tribe, and that the tribe did not understand that the investors were going to, there was going to be a conflict of interest as far as some of the purchases were concerned of some of these bonds. And that it was going to go into a roll up of a conglomerate for all of these people. And that they were on both sides of the transactions, that that would be fraudulent. Independent of anything that Golanus got. Mansion aside, and any other needs for him to get flush with cash. So I agree with my colleague that the gist of the fraud here was the misappropriation of bond money. And misappropriation- Misappropriation and part of it went, they would argue went to Golanus personally, but it wasn't necessary for the fraud. But the critical question though is what, if anything, is the evidence that Mr. Archer knew that the money was being misappropriated? Not that the money was going to be invested into these businesses. Judge Abrams discusses this at page 26 of the opinion. The bonds documents are crystal clear that the annuity is supposed to invest in private equity just like this. Their cooperator, Hugh Dunkerley, agreed that all of these investments were appropriate private equity investments for the annuity to be making. The thing that made it a misappropriation was that the issuer, the WLCC in this case, had no interest. What was the annuity? Who was going to handle the annuity? Thank you. So my colleague says that there was no annuity and Mr. Archer knew that. That is simply not the case. There was an annuity manager and there were annuity documents. And I'd point you to DA 5- What was the company that was the annuity manager? Private Equity Management. And at DA 568, you will see the investment management agreement with the annuity manager. Their cooperator, Francisco Martin, was the person associated with that. He had no improper conversations with Mr. Archer. There's simply no evidence that Mr. Archer knew that this money was being misappropriated. Can you address the document that Ms. Eddy referred to in her argument, that's government exhibit 1235? She's saying that Judge Abrams misread it. Right. So their argument, which was never made to the jury and never made to Judge Abrams and is being made for the first time today, is that that document was not a lie from Galanis to Mr. Archer but was in fact giving him talking points, even though that had never happened before. The problem is that wasn't the only time Mr. Galanis told Mr. Archer the lie, that there was a genuine annuity here being purchased. That goes back to before there ever were bonds and it goes all the way through. I'd point you to appendix, government appendix 786, which is an earlier email where Galanis tells Mr. Archer that the proceeds from the bonds are being invested in an annuity. We also have the email that Judge Abrams pointed to as exculpatory, where Mr. Galanis is explaining what happened to the bond proceeds and he says, it's $5 million to go into this winery investment and $15 million is going to be discretionary as part of the roll-up plan. Over and over and over again, the government has argued that Mr. Archer knew that this money was being misappropriated. But he didn't and there's no evidence that he did. Mr. Archer alone out of everyone in this case did not take a penny of this money and put it in his pocket. Every single person who knew- No, no, no, I understand that. That's, in fact, he paid money into it. He did. He lost some money. So, but the question I have is why the district judge didn't view the fraud the same way you are and the same way as Eddie is and the same way that appears to be the case, that you could have a misappropriation where money is taken for Purpose A and it's used for Purpose B and no money goes into Galanis' pocket. Because she kept referring throughout her opinion that the money, that there was no evidence that Archer knew that the money was going into Galanis' pocket. But that's, but we've all agreed that that's irrelevant. It's not, it's definitely not irrelevant. It's maybe not irrelevant, but that to focus on that as the source of, as the crux of the fraud is not proper. Well, I think it is proper. That was the government's argument to the jury. It was the government's argument to Judge Abrams that Mr. Archer knew the money was being out and out stolen and pocketed by Mr. Galanis. There was no evidence of that. But Judge Abrams also did recognize this alternative theory of the government, which is that money was being misappropriated by being reinvested into the roll-up. And again, she rejected that precisely because even if Mr. Archer knew the money was being used to acquire these companies, he had no idea it was a misappropriation because the bond documents permitted precisely that investment. Again, that's at page 26 of Judge Abrams' opinion. This case, Your Honor, might be right that this is a close case. But in close cases, this Court is supposed to give deference to the district court's determination. In Ferguson, this Court held that I'm saying it's close even when you give deference to the district judge's determination. I appreciate that, but this court held in Ferguson that even if this court would come to a different conclusion, it's not appropriate to overturn the grant of a Rule 33 decision unless it cannot be located within the range of permissible decisions. Judge Abrams' opinion was careful, it was thoughtful, and it was correct. It was certainly not impermissible. Thank you, Mr. Schwartz. Ms. Eddy, you have two minutes. Thank you, Your Honor. I'd like to begin, if I may, by addressing the arguments Mr. Schwartz made about Mr. Archer's knowledge of the annuity promise and that it was false. Now, the documents that Mr. Schwartz cited are the same ones that I cited earlier, showing that Archer is being made aware that an annuity representation is being made to the WAC POMNY. He also knows, however, that there is no manager. And just to give you two examples, you can see him, Jason Galanis is talking to Archer about how he is deciding what to do with the Indians' money in Government Exhibit 2216 and 2079. Archer knows there's no interest-earning annuity account here. He helps fake the interest payment for the first issuance bonds. He knows that an annuity – he's a sophisticated investor, Mr. Archer is. He is a self-described expert in asset management. He describes himself as that in front of the bid board. Now, he knows that an annuity provider, an annuity account manager, does not take his client's money and plow it back into the bonds that the client is issuing, secretly, without telling the client he's doing this. That's what happens with the $15 million. The evidence – I really don't think this was a close case, particularly when one identifies the gist of the fraud correctly. Well, as I said before, the problem is that generally deference is given to the district judge in this kind of a determination. Well, generally, deference is owed in the first instance to the jury's factual findings, right? I mean, the Court – this Court and others have made very clear that even under Rule 33 – this is the Bell case, for example, in 2009 from this Court – even under Rule 33, the Court owes deference to the jury's credibility determination and resolution of competing inferences. Would you identify which of Judge Abrams' inferences, contrary to the inferences presumably drawn by the jury, were without her field of discretion? I think the inference that Archer did not know the annuity promise was false is one. Another big one, and this is the other part of the fraud right, is that Archer did not know that the Hughes and Atlantic clients were being deceived in their purchase of the bonds. Now, I think any reasonable – Being deceived as to – As to the conflicts of interest that were at issue here. I mean, no reasonable sort of straight-thinking pension fund manager would agree to buy these illiquid tribal bonds knowing that the placement agent, the party that's supposed to pay the interest on the bonds, and his own advisor are all controlled by the same people. I mean, that's absurd. An advisor, or a pension fund manager in those circumstances, would fire its advisor, which is exactly what happened here when the truth became known. So you're saying that he knew of the conflict regarding Atlantic, but what about – there was a conflict also involving the first – Involving Hughes as well, and yet there was evidence that he knew in advance – I mean, Judge Abrams did credit that Archer knew in advance that the purpose of buying up Hughes was to place the tribal bonds. Yeah. And Hughes is acquired with funds coming from Wealth Assurance Holdings, where Archer's a director. And Hugh Dunkerley is involved in all of these entities, on all sides of these transactions. So that is, I think, a second inference that was simply not supported by the record. And another one is the inference that Archer's lies were meant – were either fed by Golanus, or were meant to simply cover up the involvement of Golanus. Now, with respect to the first one, the two lies he tells at different points in time about the provenance of these bond proceeds is they come from real estate sales. Now, he says they come from his own real estate sales, but putting even that aside, they come from real estate sales. And later, that Calvert – actually, this fictional company – Calvert supplied the funding for those bonds because it's the beneficial owner. Those are inconsistent lies, and the notion that Archer could have believed both of those coming from Golanus is untenable. Well, as far as Calvert's concerned, returning the bonds to Calvert, at least as far as the $15 million are concerned, is directly contradicted by the fact that he himself paid for the $15 million. Absolutely. He knows that Calvert didn't supply those funds. And just to address the second of those inferences, the second theory that Judge Abrams embraced, which was Archer was just hiding the involvement of Golanus – I spoke about this earlier – there was a lot more to hide here than Golanus's involvement. These bonds, these proceeds are obviously coming from the first issuance, given all the circumstances surrounding it. If the Court would allow me, I would like to briefly address the heavily preponderate standard once more. Well, I think we need to nail down the standard, so go ahead. I agree. Look, that has to be the standard under these circumstances, or something approaching it, something akin to it, because otherwise the district court is simply sitting as the jury was and the jury becomes superfluous. That is not our system of criminal justice. It also makes no sense to suggest that it's easier to throw out the verdict when it's just a matter of competing inferences, as in this case, than it is when there's perjury, right? It doesn't make sense. Unless the Court has further questions, we will rest on our papers. We ask that the district court's ruling be reversed and that the jury's verdict be reinstated in this case. All right. Well, reserved, very well argued. Thank you. Both of you, and team.